UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MARTIN J. WALSH, Secretary of | * | |
| Labor, United States Department of | * | |
| Labor, | * | CIVIL ACTION |
| | * | |
| Plaintiff, | * | No. 21-550-JWD-SDJ |
| | * | |
| v. | * | |
| | * | |
| RIVET & SONS, LLC, | * | |
| GLYNN J. RIVET, Individually, | * | |
| BRENT RIVET, Individually and | * | |
| CLINTON RIVET, Individually | * | |

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff, Martin J. Walsh, Secretary of Labor (Secretary), U.S. Department of Labor (DOL), submits this memorandum of law in support of the Secretary's motion for a temporary restraining order (TRO) and preliminary injunction enjoining Defendants Rivet & Sons, LLC (Rivet LLC), Glynn Rivet, Brent Rivet, and Clinton (Clint) Rivet (collectively, Defendants) from violating the anti-retaliation provisions of the DOL's regulations implementing the H-2A provisions of the Immigration and Nationality Act (INA), 8 U.S.C. § 1188, related to Defendant Rivet LLC's employment of fourteen temporary agricultural workers (hereafter referred to as H-2A workers), and to further compel Defendants to take all actions necessary to ensure the safety of Defendant Rivet LLC's current and future H-2A workers by protecting them from potential violence and from the deprivation of potable water and restroom and washing facilities.

On June 28, 2021, the U.S. Department of Labor, Wage and Hour Division (Wage Hour) received a complaint and video from the United States Consulate in Monterrey Mexico regarding

an employer who mistreated farm workers the employer hired through the H-2A provisions of the

Immigration and Nationality Act, 8 U.S.C. § 1188. The complaint read:

> On June 16, 2021, FPU Monterrey received phone calls, emails, and video evidence of Glynn Rivet, owner of Rivet & Sons LLC, threatening workers with a gun, allegedly in response to workers asking for more food and for a water faucet to be moved back closer to their living quarters. According to one worker, they asked Mr. Rivet for more food and water, and after he did not provide anything, they brought their concerns to his son. At that point, Mr. Rivet responded by insulting them and threatening them with a gun, shooting twice into the air. At least three workers decided to leave the work site and file a police report.

(Exhibit 1, Declaration of Derek Madison ¶ 5).

In the video, Glynn Rivet, owner of Rivet LLC, can be seen and heard screaming obscenities at four of the H-2A workers and threatening them with two pistols which he fired at least two times during the course of his tirade in response to them asking his son Brent Rivet for food and water. Upon receiving the complaint and video, Wage Hour opened an investigation into the incident and assigned it to Wage Hour Investigator Derek Madison out of the New Orleans District Office. (Declaration ¶ 6).

## I.    BACKGROUND

### A.  Defendant Rivet LLC's Employment of H-2A Workers.

Rivet LLC is a limited liability company, formed in November 2019, under the laws of the State of Louisiana. (Declaration ¶ 34). In June 2021, the manager and officer of Rivet LLC was Glynn Rivet, who worked with his two sons, Clint and Brent Rivet, harvesting sugarcane and soybeans on nine different properties, seven in Iberville Parish, and two in Pointe Coupee Parish. *Id*. Prior to the formation of the LLC, the business was operated by Glynn Rivet and his sons under the name Glynn Rivet & Sons. *Id*. The current and former company have been hiring H-2A workers as a source of labor for a number of years in the same manner at the same location and

farming the same land. *Id.* Glynn Rivet served as the officer, manager, and part-owner of Rivet LLC, and managed its daily operations with his sons until at least June 9, 2021. From January to July 2021, Rivet LLC had a net profit of over $3.4 million. (Declaration ¶ 37).

Defendant Rivet LLC hires foreign workers under the H-2A provisions of the INA, 8 U.S.C. § 1101, et seq., which authorizes the lawful admission of temporary, nonimmigrant workers to perform agricultural labor or services of a temporary or seasonal nature (hereafter referred to as H-2A or the H-2A program). To hire H-2A workers, an employer must first seek from DOL a certification that there are insufficient able, willing, and qualified U.S. workers to perform the needed labor or services.  8 U.S.C. § 1188; 20 C.F.R. 655 subpt. B; 29 C.F.R. part 501.  Pursuant to these authorities, Defendant Rivet LLC filed an Application for Temporary Employment Certification (TEC) with DOL for its 2021 farming operation. (Declaration ¶ 35).  TEC H-300-21005-95535 was approved, and authorized Rivet LLC to hire 15 H-2A agricultural workers to farm sugarcane and soybeans for the period of March 15, 2021 through January 15, 2022, at its nine farms located in Iberville and Pointe Coupee Parishes.[1] (Declaration ¶ 36).

As an H-2A employer, "during the period of employment that is the subject of the Application for Temporary Employment Certification, the employer must comply with all applicable Federal, State, and local laws and regulations, including safety and health laws." 20 C.F.R. § 655.135(e). Such laws include OSHA's Field Sanitation standard found at 29 C.F.R. § 1928.110, as well as federal, state, and local criminal laws. The Field Sanitation standard requires an employer to provide potable water which is accessible to all employees, and which is "suitably cool and in sufficient amounts, taking into account the air temperature, humidity and the nature of

---

[1] Rivet LLC hired 15 H-2A employees, but one of the H-2A workers left his employment with Rivet LLC and returned to his country prior to the events of June 7-8, 2021.

MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION    Page 3

the work performed, to meet the needs of all employees." 29 C.F.R. § 1928.110(c)(1)(i) and (ii).

An employer must also provide toilet and handwashing facilities. 29 C.F.R. § 1928.110(c)(2). In

addition, an H-2A employer "either must provide each worker with three meals a day or must

furnish free and convenient cooking and kitchen facilities to the workers that will enable the

workers to prepare their own meals." 20 C.F.R. § 655.122(g). Rivet LLC chose to satisfy this

obligation by providing kitchen facilities that enabled the workers to prepare their own meals,

including preparing and bringing their lunches with them to the fields. The Department's H-2A

regulations further prohibit any "person" from retaliating against any person who has engaged in

certain protected activities under the H-2A program. 29 C.F.R. § 501.4; *see also* 20 C.F.R. §

655.135(h) (H-2A employer must assure that it has not and will not retaliate against any person

who has engaged in protected activity).

### B. The H-2A Workers Faced Long Hours and Strenuous Work in Extremely Hot and Humid Conditions.

During their employment, the H-2A workers who work for Rivet LLC face grueling

conditions working in hot and humid weather, sometimes seven days a week depending on the

weather. Most days they work ten or more hours a day in fields that lack potable drinking water

and toilet and handwashing facilities. Workers travel to the fields in a bus, and start their work day

between 6 and 7 a.m. They work in one of nine different fields depending on the day. They are

moved around to different fields frequently during the week and sometimes to different fields

daily. (Declaration ¶ 11).

Workers typically bring their food and water with them on the bus to the worksite, and

Clint and Brent Rivet sometimes bring them additional water during the day. Because of the lack

of handwashing facilities, the workers have to use their drinking water to wash their hands. Once

in the fields, the workers perform agricultural labor including hand planting and harvesting

sugarcane. They use machetes to clear vegetation in and around the fields and use shovels to dig ditches, clear water from ditches, and divert water. They also clear weeds from the fields. (Declaration ¶ 12).

### C. The Workers were Denied Adequate Water While Working in the Fields.

On the morning of June 7, 2021, (the day prior to the handgun incident), four workers – Juan Carlos Diaz Martinez, Julio Caesar Diaz Martinez, Raul Rivera Lopez and Leonel Saul Silva-Ibarra (Complainants) – were working together in a field with limited water and no toilets or handwashing facilities. (Declaration ¶ 13). They started working at approximately 7 a.m.[2]

After working nearly three hours, the Complainants asked Glynn Rivet for water. He responded that they should drink the rainwater that had accumulated in the ditch and he did not provide them with water.  In describing the day, one Complainant reported, "The boss spent the rest of the day pressuring us, he never left our side because he was upset. He has always been the type of person to use foul language and treat us bad. He would call us stupid basically with the intention of trying to offend us." From the time the workers asked Glynn Rivet for water through the end of that day and the next, Complainants had difficulty obtaining water while working and were subjected to hostility and retaliation by Glynn Rivet. (Declaration ¶ 15)

Despite being denied water by Glynn Rivet, Complainants continued to work. One of the Complainants finally called Clint Rivet asking him for water. Around noon, Clint Rivet brought them water, but only about two to three gallons which had to last the four Complainants until the end of the workday. According to the Complainants, the amount of water Clint provided them would normally only last them about two hours, not the four or five hours they had left to work

---

[2] Notably, June is one of the hottest and most humid months of the year in Louisiana. One worker indicated that workers had passed out in the fields from the heat. (Declaration ¶ 14).

that day. Although June 7, 2021, was a difficult day, the workers managed to finish the day, exhausted from having spent so much time in the heat with limited access to water. (Declaration ¶ 16).

### D. Glynn Rivet Retaliated Against Complainants for Asking his Son for Food and Water by Screaming Obscenities at them and Threatening them with two Pistols.

The next day, June 8, 2021, the workers arrived at the first field between 6:45 and 7 a.m. where they were split into groups. Glynn Rivet told the four Complainants to get in his truck. As they were getting into the back of his truck, Glynn Rivet told the Complainants to leave their lunches and water on the bus because "they would not need them." He then transported them to a field that was particularly difficult to work and could not be accessed by bus and dropped them off. (Declaration ¶ 17). As he was driving away, he yelled, "I am the one with the power here." In the field that morning, the workers were using shovels to move the dirt so that water from the recent rain could flow out of the channels. They were also removing the weeds from the fields. (Declaration ¶ 18).

After a few hours, Clint Rivet picked up Complainants and brought them to where the other workers were working, which was near Rivet LLC's bus containing their lunches and water. (Declaration ¶ 19). However, as soon as they got there, Glynn Rivet instructed Clint Rivet to take Complainants to a different field about a mile and a half away, and the Complainants were not given the opportunity to get their lunches or water. *Id.* Shortly after being dropped off, Glynn Rivet arrived and parked his truck right in front of Complainants and sat watching them so they couldn't take any breaks or stop to look for water. (Declaration ¶ 20). One Complainant stated, "He was just sitting smiling at us as if he was laughing at how thirsty we were." *Id.* Glynn Rivet then left Complainants in the empty field with limited water and no food. *Id.*

After he left, one of the Complainants called a co-worker that was near the bus to see if they could get access to their food and water, but they didn't have a key for the bus. (Declaration ¶ 20). Between 12:45 and 1 p.m., Complainants called Brent Rivet to see where he was and if he could assist in getting them their food and water. He said he was far away but would see what he could do. (Declaration ¶ 21).

After working nearly six hours without food and sufficient water, Complainants started walking the 1.5 miles to the bus for their lunches and water. (Declaration ¶ 17, 21). After walking nearly 40 minutes in the heat, dehydrated, hungry, and exhausted, Complainants heard shouting between Brent Rivet and Glynn Rivet. One worker stated, "We heard a gunshot and then afterwards we saw the boss in his truck driving very fast toward us. In that moment we thought we were in danger and that's why we decided to record with our phones." (Declaration ¶ 22). At least three Complainants started recording what was happening using the video functions on their phones. *Id*. The Complainants believed that Glynn Rivet was driving around 60 mph until he arrived close to where the Complainants were walking. (Declaration ¶ 23). When Glynn Rivet pulled up, he almost ran over one of the workers who had to quickly jump out of the way to avoid being hit by the mirror of the truck. (Declaration ¶ 24). There were five other H-2A workers in the back of the truck who witnessed the event. *Id*.

Upon arrival, Glynn Rivet got out of his vehicle, leaving it in the middle of the road. (Declaration ¶ 25; see also Attachment A to Declaration). He had a pistol in each hand and was very agitated. *Id*. He immediately started screaming obscenities at the Complainants while pointing the guns at them. *Id*. This incident occurred in the middle of farmland where there was no place to run or hide. At one point it became obvious that Brent Rivet had told his father about the Complainants' phone call asking for food and water and he was furious about it, screaming, "Get

those fucking lunches out of that - you can call me, you want to call Brent and Clint to tattle on me?" (Declaration ¶ 25).

In the middle of his tirade, Glynn Rivet fired at least two shots, one in the air and one into the ground in front of Complainants.[3] (Declaration ¶ 26; *see also* Attachment 1 of the Declaration). A cloud of dust can be seen in the bottom left corner of the video after the bullet hit the ground (*see* the video at the 1:05 second mark). One of the Complainants said, "I did think that Glynn might kill me during the incident, he was also pointing the gun right at me." (Declaration ¶ 26). Another Complainant stated, "I was very afraid; we were frightened so we called the police." (Declaration ¶ 27). Glynn Rivet finally got back in his truck and sped away. The Complainants started walking back toward the bunk houses instead of returning to work because they were afraid. *Id.*

### E. Complainants Called the Police and Provided Statements that Resulted in Glynn Rivet's Arrest.

As Complainants walked toward the bunk houses, they called the local police who arrived within 15 minutes of the call. (Declaration ¶ 28). The Complainants showed the videos to the local police officer who said he was going to call the sheriff. *Id.* The Pointe Coupee Sheriff's Department arrived shortly thereafter and took a signed statement from the Complainants. *Id.* The Complainants relayed to the Sheriff's officer what had happened. They also told the Sheriff's officer "that Mr. Rivet had been telling them he would kill them recently and making other threats." (*See* Police Report, Attachment E to Declaration).

---

[3] Eye witnesses to the event were inconsistent in their reporting of how many shots were fired.  At least two eyewitnesses said three shots were fired, two in the air and one at the ground, while another stated that two shots were fired.

Glynn Rivet was charged with four felony counts of aggravated assault with a firearm and illegal use of weapons or dangerous instrumentalities. (Declaration ¶ 29, *see also* Attachment E to the Declaration). Glynn Rivet voluntarily surrendered to the Sheriff's Office on June 11, 2021 but bonded out shortly after being booked. *Id.* He is not currently incarcerated. *Id.*

**F.    Clint Rivet's Subsequent Efforts to Intimidate and Coerce the Workers.**

After the June 8, 2021 incident, the four Complainants stayed in the bunk houses for five or six days. (Declaration ¶ 30). During that time, Clint Rivet visited the Complainants and told them that they "had to drop the charges." (Declaration ¶ 31). He threatened that if they didn't, the work on the farm would come to an end for everyone. *Id.* When the Complainants refused to drop the charges, Clint Rivet said he would come back and ask them again, which he did. *Id.*

After those attempts failed, one of the other H-2A workers approached Complainants and told them that the boss said he would pay them money through the end of the contract and they would be able to work anywhere in the United States if they dropped the charges. (Declaration ¶ 32). The Complainants again refused. *Id.* At some point Complainant Leonel Saul Silva-Ibarra recanted his statement to the police and went back to work for Rivet LLC. *Id.* At some point while the Complainants were staying at the bunk house, Clint Rivet approached them and told them if they were not going to work, they had to leave, which they did. *Id.* One of the Complainant's subsequently learned that Glynn Rivet had threatened to kill him after this incident. (Declaration ¶ 39).

On June 14, 2021, Rivet LLC reported to U.S. Citizenship and Immigration Services that, "3 workers left employment with Rivet & Sons, LLC per their choice. Workers failed to report to work and missed 5 consecutive workdays." (Declaration ¶ 33). No mention was made of the workplace violence. *Id.*

### G. Rivet LLC's Inaccurate Assertion of Remedial Action Delayed this Case.

In July 2021, Wage Hour was provided with a letter from counsel for Rivet LLC and Brent and Clinton Rivet, stating that:

> Immediately after the June 8, 2021 incident, Rivet & Sons, LLC undertook diligent review with respect to how the farm would verify H-2A compliance, cure any deviation from compliance with respect to the June 8, 2021 incident, respond to any and all of Glynn Rivet's actions that deviated from H-2A compliance with respect to the June 8, 2021 incident, and redetermine its corporate affairs going forward. The business was re-organized days later on terms that removed Glynn Rivet from a director role in the going concern.

(Declaration ¶ 37).

After reading the letter, Wage Hour believed steps had been taken to keep Glynn Rivet away from the workers and that he no longer posed a danger to the workers. (Declaration ¶ 38). The week of August 23, 2021, however, Wage Hour Investigator Madison learned through employee interviews that Glynn Rivet has been in the direct vicinity of the H-2A workers, interacted with some of them, and has watched them from his car while they worked in the fields. (Declaration ¶ 39). He also learned that Glynn Rivet had recently threatened to kill one of the Complainants. *Id.*

### II. LEGAL ARGUMENT

### A. The INA and H-2A Regulations Authorize Injunctive Relief.

The INA authorizes the Secretary to seek injunctive relief and specific performance of contractual obligations pursuant to 8 U.S.C. § 1188(g)(2) which states:

> The Secretary of Labor is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under this section.

Pursuant to the authority given to the Secretary under the INA, DOL promulgated regulations at

20 C.F.R. part 655, subpart B and 29 C.F.R. part 501, which expressly authorize the Secretary to seek injunctive relief in H-2A cases.  For example, in describing the role of WH in H-2A cases, the regulations at 29 C.F.R. § 501.1(c) authorize the Secretary "to seek injunctive relief and specific performance of contractual obligations, including recovery of unpaid wages and reinstatement of laid off or displaced U.S. workers."

Likewise, 29 C.F.R. § 501.16(c) which addresses sanctions and remedies pursuant to H-2A, states:

> Whenever the WHD Administrator believes that 8 U.S.C. 1188, 20 CFR part 655, subpart B, or the regulations in this part have been violated, such action shall be taken and such proceedings instituted as deemed appropriate, including (but not limited to) the following: …
> (b) Petition any appropriate District Court of the U.S. for temporary or permanent injunctive relief, including to prohibit the withholding of unpaid wages and/or for reinstatement, or to restrain violation of 8 U.S.C. 1188, 20 CFR part 655, subpart B, or the regulations in this part, by any person.
> (c) Petition any appropriate District Court of the U.S. for an order directing specific performance of covered contractual obligations.

The regulations also expressly provide for injunctive action in instances involving discrimination or retaliation. 29 C.F.R. § 501.4(b) states expressly:

> (b) Allegations of discrimination against any person under paragraph (a) of this section will be investigated by the WHD. Where the WHD has determined through investigation that such allegations have been substantiated, appropriate remedies may be sought. The WHD may assess civil money penalties, seek injunctive relief, and/or seek additional remedies necessary to make the employee whole as a result of the discrimination, as appropriate, initiate debarment proceedings, and recommend to OFLC revocation of any such violator's current labor certification.

At least two federal courts have granted injunctive relief where H-2A employers violated H-2A provisions and endangered workers. *See Acosta v. Marin J. Corporation*, No. 1:18-CV-00184 (E.D. Mo. Aug. 7, 2018) (Order Granting Preliminary Injunction); *Acosta v. G Farms, LLC*, No. CV-17-01446-PHX-DLR (D. Ariz. May 19, 2017) (Order Granting Stipulated Entry of

Preliminary Injunction). (*See* Exhibits 2 and 3, Orders Granting Preliminary Injunctions). Therefore, the Secretary is authorized to seek the relief requested.

### B. A TRO is Necessary to Restrain Defendants from Further Retaliation and to Protect Employees from Potential Harm.

The TRO sought by the Secretary is an extraordinary request forced by Defendants' serious and alarming threats against Complainants and their failure to provide adequate water or toilet and handwashing facilities in the field. A party seeking a TRO under Federal Rule of Civil Procedure 65, "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 20 (2008) (discussing standard for preliminary injunction); *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (setting forth the four elements a plaintiff must establish to secure a preliminary injunction) (quoting *Byrum v. Landreth,* 566 F.3d 442, 445 (5th Cir. 2009)); *Mississippi Power & Light Co. v. United Gas Pipe Line Co*, 760 F.2d 618, 621 (5th Cir. 1985) (same). To obtain a TRO, an applicant must show entitlement to a preliminary injunction. *May v. Wells Fargo Home Mortgage*, No. 3:12-CV-4597-D, 2013 WL 2367769 (N.D. Tex. May 30, 2013).

### C. The Secretary Is Likely to Succeed On the Merits of a Retaliation Claim and to Prove Violations of the Field Sanitation Standard.

DOL's H-2A regulations prohibit retaliation by any "person" against any person who has exercised rights protected under the H-2A program. 29 C.F.R. § 501.4. Specifically, the regulation provides:

> A person may not intimidate, threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate against any person who has:
> (1) Filed a complaint under or related to 8 U.S.C. 1188 or the regulations in this part;
> (2) Instituted or caused to be instituted any proceedings related to 8 U.S.C. 1188 or the regulations in this part;

(3) Testified or is about to testify in any proceeding under or related to 8 U.S.C. 1188 or the regulations in this part;

(4) Consulted with an employee of a legal assistance program or an attorney on matters related to 8 U.S.C. 1188, or to this subpart or any other Department regulation promulgated pursuant to 8 U.S.C. 1188; or

(5) Exercised or asserted on behalf of himself or others any right or protection afforded by 8 U.S.C. 1188 or the regulations in this part.

*Id*. *See also* 20 C.F.R. § 655.135(h) (when filing Application for Temporary Employment Certification, employer must assure that it "has not and will not intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against, and has not and will not cause any person to intimidate, threaten, restrain, coerce, blacklist, or in any manner discriminate against, any person who has" engaged in activity protected under the H-2A program).

Under similar anti-retaliation provisions of other employment statutes, the Fifth Circuit generally requires a plaintiff to show that the employee engaged in protected activity, that the employee suffered an adverse action, and a causal link exists between the protected activity and the adverse action. *See, e.g., Starnes v. Wallace*, 849 F.3d 627, 631-632 (2017) (prima facie case of retaliation under the FLSA requires showing of participation in protected activity, adverse employment action, and a causal link between the activity and the adverse action); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir. 1992) (articulating elements for claim of retaliation under Title VII of the Civil Rights Act and under the Age Discrimination and Employment Act); *Hagan v. Echostar Satellite L.L.C.*, No. H-05-1365, 2007 WL 543441, at *4 (S.D. Tex. Feb. 16, 2007), *aff'd*, 529 F.3d 617 (5th Cir. 2008) (applying this standard in a Fair Labor Standards Act retaliation case). The Secretary can establish these three elements and therefore is likely to succeed on the merits.[4]

---

[4] In Title VII, ADEA, and FLSA cases where there is no direct evidence of discrimination, the Fifth Circuit applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and clarified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Shirley*, 970 F.2d at 42 n.5 (Title VII

**Protected Activity**.  DOL's H-2A regulations explicitly set forth the activities protected by the provision.  29 C.F.R. § 501.4(a)(1)-(5); 20 C.F.R § 655.135(h)(1)-(5).  The Secretary can prove that Complainants engaged in activities protected under the H-2A anti-retaliation provisions at 29 C.F.R. § 501.4(a) and 20 C.F.R. § 655.135(h) when they requested food and water, and when they called the police, provided the police with statements, and subsequently refused to recant their statements.

The Complainants' request for their lunches on June 8, 2021 was an assertion of their rights under H-2A, and thus was protected under 29 C.F.R. § 501.4(a)(5).  H-2A employers are required to either provide each worker with three meals a day or to furnish free and convenient cooking and kitchen facilities to allow the workers to prepare their own meals. *See* 20 C.F.R. § 655.122(g). Of course, implicit in the option to provide kitchen facilities is a requirement that the employees must have access to those meals once prepared. Rivet LLC chose to furnish cooking and kitchen facilities to allow workers to prepare their own meals. The Complainants prepared their lunches on June 8, 2021 and brought their lunches with them on the bus that transported them to the fields. Asking for access to the lunches they prepared and brought with them was an assertion of a right afforded to them by the H-2A program.  29 C.F.R. § 501.4(a)(5); 20 C.F.R. § 655.135(h)(5).

With respect to the Complainants' requests for water, H-2A employers are required to comply with federal, state, and local laws pursuant to 20 C.F.R. § 655.135(e), including OSHA's Field Sanitation standard found at 29 C.F.R. § 128.110.  The Field Sanitation standard requires

---

and ADEA); *Hagan*, 529 F.3d at 624 (FLSA).  Under this framework, a plaintiff must make a prima facie showing of the three elements of a retaliation claim.  *Id.*  "If a plaintiff meets this burden, the defendant must then articulate a legitimate, non-discriminatory reason for its decision. The burden then shifts to the plaintiff to demonstrate that the proffered reason is a pretext for discrimination." *Id.*  However, this burden-shifting framework does not apply in cases of direct evidence of discrimination.  *Id.*  Moreover, the *McDonnell Douglas* framework "drops out" when the case proceeds to the merits of the "ultimate question" of whether the defendant retaliated in violation of the statute. *Hagan*, 529 F.3d at 625 n.8.

employers to provide employees with accessible potable water which is "suitably cool and in sufficient amounts" to meet the needs of all employees." 29 C.F.R. § 1928.110(c)(1)(i) and (ii). Therefore, Complaints were entitled to water and their requests for such were also an assertion of their rights.  29 C.F.R. § 501.4(a)(5); 20 C.F.R. § 655.135(h)(5).

Complainants' call to the police in response to Glynn Rivet's threatening conduct, their participation with the police in providing statements, and their refusal to later recant the statements they had given to the police were all protected activities. The provisions at 29 C.F.R. § 501.4(a)(1) and 20 C.F.R § 655.135(h)(1) specifically protected the Complainants from retaliation for filing a complaint.  Moreover, the statements Complainants gave to the police along with the videos they took that documented the events of June 8, 2021, caused Wage Hour to initiate an investigation and caused Glynn Rivet to be charged with four felony counts of aggravated assault with a firearm and a related misdemeanor for violations of Louisiana state law. Accordingly, those activities were also protected under 29 C.F.R. § 501.4(a)(2) and 20 C.F.R. § 655.135(h)(2) because they "instituted or caused to be instituted" a proceeding related to H-2A.

**Adverse Action.**  DOL's H-2A regulations explicitly set forth the adverse actions prohibited by the anti-retaliation provision.  29 C.F.R. § 501.4(a); 20 C.F.R § 655.135(h).  The Secretary can also show the Defendants took adverse employment actions against the Complainants prohibited by 20 C.F.R. 655.135(h) and 29 C.F.R. 501.4(a), including threats, intimidation, coercion, discrimination, and ultimately constructive discharge.

The Complainants reported that in response to their request for water on June 7, 2021, Glynn Rivet denied them water, instead instructing them to drink from the ditch. From that point through the end of the next day, Complainants had difficulty obtaining adequate water while working in the fields. In response to Complainants' requests to Brent Rivet for their lunches on

June 8, 2021, Glynn Rivet nearly ran Complainants down with his truck, swore at them, pointed guns at them calling some of the Complainants by name, and intimidated and threatened them by shooting the gun at least twice, once in the air and once at the ground in front of them. Glynn Rivet's actions directed at the Complainants were so egregious he was charged with four felony counts of aggravated assault with a firearm.

Defendants' actions toward the three Complainants who refused to recant their statements to the police amounted to constructive discharge. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). The inquiry is whether the working conditions became "so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Id. See also Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 480 (5th Cir. 2008); *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

In this case, the Complainants' visa status made them vulnerable to exploitation by their employer. Because the Complainants were H-2A workers, their choices in response to Defendants' actions were limited because the workers were not free to seek other employment in the United States. Their visas were tied to the TEC filed by Rivet LLC and these workers were authorized only to work at the sugarcane and soybean farm for Rivet LLC from March 15, 2021 until January 15, 2022. Nevertheless, if the Complainants stayed on the farm, they would likely be subjected to continuing threats, violence, and intimidation by Glynn Rivet, and possibly suffer serious health consequences if they continued to be deprived of sufficient food and water. A reasonable person in the Complainants' position, facing such conditions, would have felt compelled to resign. Thus, Juan Carlos Diaz Martinez, Julio Caesar Diaz Martinez, and Raul Rivera Lopez suffered

constructive discharge to avoid further acts of violence and retaliation.

**Causal Connection.**  There is sufficient evidence for the Secretary to show a causal link between the workers' protected activities and the adverse actions.  Defendant Glynn Rivet's words and conduct in response to the Complainants' requests for water provide direct evidence of causation. When the Complainants asked Glynn Rivet for water, he told them to drink from the ditch.  When Glynn Rivet found out the Complainants had asked his son Brent to bring them their lunches and water, Glynn Rivet immediately launched into a violent tirade, first directed at his son Brent, and then directed at the Complainants, where he specified that his anger was due to their request for food and water, which he derogatorily referred to as "tattling."

Courts also "have recognized numerous ways in which plaintiffs [can] circumstantially show" a causal connection. *Flowers v. Texas Mil. Dep't*, 391 F. Supp. 3d 655, 669–70 (S.D. Tex. 2018) (citing *Robinson v. Jackson State Univ.*, 714 F. App'x 354, 361 (5th Cir. 2017) (recognizing "temporal proximity, specific conversations with knowledgeable colleagues, changed decisionmaker behavior following complaints, pretext, and parallel outcomes for similarly-situated employees" as circumstantial evidence of causation under Title VII)).  Here, the Secretary can show that Defendants had knowledge of the protected activities, there was close proximity in time between the protected activities and adverse action, and the Defendants showed animus toward the protected activities.

Defendants knew that the Complainants engaged in protected activity when they asked for water because the Complainants expressly requested food and/or water from all three of the Rivets. The Defendants also knew that the Complainants called the police as evidenced by Clint Rivet's attempt to coerce the Complainants to drop the charges against his father. The Defendants likewise knew that three of the Complainants refused to recant their statements to the police because

Complainants told Clint Rivet that they refused to do so and because Glynn Rivet was charged with four felony counts of aggravated assault with a firearm.

There was also close proximity in time between the Complainants' protected activities and the adverse actions. Glynn Rivet's refusal to provide food and water immediately followed the Complainants' requests for such. His tirade on June 8, 2021, occurred within a very short period of time after he learned that the Complainants had called Brent Rivet asking for food and water. Clint Rivet's demand that the Complainants recant their statements occurred within days after the Complainants had filed a complaint with the police, and the Complainant's were constructively discharged less than a week after the events of June 8, 2021.

Finally, the Defendants expressed animus toward the Complainants for engaging in protected activities. Glynn Rivet showed extreme animus and hostility toward the Complainants' requests for food and water, including directing them to drink water out of a ditch and screaming obscenities at the Complainants while pointing guns at them and firing the guns in their presence. Clint Rivet pressured and coerced the Complainants to recant their statements to the Sheriff, telling them that all the H-2A workers would lose their jobs if they refused. All these factors are very strong evidence of a causal connection between Complainants' protected activities and Defendants' adverse actions.

Accordingly, because the Secretary can establish that the Complainants engaged in protected activities and suffered adverse actions, and through both direct and circumstantial evidence show is a causal connection between the protected activities and adverse actions, the Secretary is likely to succeed on the merits of his claim of retaliation.[5]

---

[5] As explained in note 2, *supra*, the *McDonnell Douglas* burden shifting framework does not apply here because the Secretary can show direct evidence of retaliation, nor will the framework apply to adjudication of the "ultimate question" of retaliation. *Supra*, p. 13 n. 2. However, even if that framework does apply here, Defendants cannot

**Field Sanitation Standard**.  As an H-2A employer, "during the period of employment that is the subject of the Application for Temporary Employment Certification, the employer must comply with all applicable Federal, State, and local laws and regulations, including safety and health laws." 20 C.F.R. § 655.135(e). Such laws include OSHA's Field Sanitation standard found at 29 C.F.R. § 1928.110.

OSHA's Field Sanitation standard, 29 C.F.R. § 1928.110, applies "to any agricultural establishment where eleven (11) or more employees are engaged on any given day in hand-labor operations in the field."  The standard defines an "agricultural establishment" as "a business operation that uses paid employees in the production of food, fiber, or other materials such as seed, seedlings, plants, or parts of plants." 29 C.F.R. § 1928.110(b)(iii).  Rivet LLC's sugarcane and soybean farm and its associated fields qualify as an agricultural establishment, and on the date of the retaliation in this case it employed 14 workers who were engaged in hand-labor operations in the fields. Thus, Rivet LLC was subject to OSHA's Field Sanitation standard

The Field Sanitation standard requires employers to provide its employees engaged in hand-labor operations in the field potable drinking water which shall be in locations readily accessible to all employees. *See* 29 C.F.R. § 1928.110(c)(1)(i). The water must be "suitably cool and in sufficient amounts, taking into account the air temperature, humidity and the nature of the work performed, to meet the needs of all employees." 29 C.F.R. § 1928.110(c)(1)(ii).

The Field Sanitation standard also requires employers to provide toilet and handwashing facilities for employees who perform field work for at least three hours. 29 C.F.R. §

---

articulate any legitimate, non-discriminatory reason for their egregious and violent conduct here; indeed, what legitimate basis can an employer possibly have for depriving workers of water, threatening workers with a gun, and forcing them out of employment for refusing to drop the resulting criminal charges.  Likewise, any argument that Complainants "quit" or abandoned their employment is demonstrably pre-textual.

1928.110(c)(2). The toilet facilitates must be "adequately ventilated, appropriately screened, have self-closing doors that can be closed and latched from the inside and shall be constructed to insure privacy." 29 C.F.R. § 1928.110(c)(2)(ii). The toilet and handwashing facilities must be located within a quarter-mile walk of each hand laborer's place of work in the field and must be maintained in accordance with appropriate public health sanitation practices. 29 C.F.R. §§ 1928.110(c)(2)(iii) and (c).

The Secretary will be able to prove that Rivet LLC failed to comply with the Field Sanitation standards. Rivet LLC currently employs at least 11 H-2A employees who work in the fields ten or more hours a day, and in June it employed at least 14 H-2A employees. (Declaration ¶ 12, 35). Employees perform agricultural labor in the fields, including hand planting and harvesting sugarcane. (Declaration ¶ 12). They also use machetes to clear vegetation in and around the fields and use shovels to clear weeds, dig ditches, clear water from ditches and divert water. *Id.*

As is evidenced by the facts in this case, the workers do not always have potable water readily accessible to them, and they often have to rely on other people to bring them water. (Declaration ¶ 13. 15, 16, 20, 21). In addition, at times they are not provided with a sufficient amount of water taking into account the air temperature, humidity, and nature of the work. (Declaration ¶ 16). This is in violation of the Field Sanitation standard.

In addition, the fields lack toilets and handwashing facilities. (Declaration ¶ 11). The employees reported that they urinate and defecate in the fields and use drinking water if they want to wash their hands. (Declaration ¶ 11, 12).

Based on the evidence in this case, the Secretary can show a likelihood of success on the merits regarding Defendants' failure to comply with all applicable federal, state, and local laws,

including OSHA's Field Sanitation standard.

**D. Without an Order Enjoining Defendants from Further Retaliation and Compelling Defendants to Comply with the Field Sanitation Standard, the Workers and the Secretary are Likely to Suffer Irreparable Harm.**

The Secretary, Complainants and the remaining 11 H-2A workers at Rivet LLC are likely to suffer irreparable harm in this case if Defendants are not enjoined from threatening workers who are already fearful and will continue to be fearful without court intervention. The Secretary has been authorized to enforce the terms and conditions of employment under the H-2A program. In this case, where H-2A workers have been threatened with guns and coerced to recant their statements to the police, which can only be done with the Court's intervention.

As the Fifth Circuit has recognized, the chilling effect of retaliation on the willingness of migrant farmworkers in particular to assert their rights has been well-documented. *See Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1332 (5th Cir.1985) (noting that farm workers who attempt to assert their rights must overcome a general background of fear and intimidation caused by the widespread practice of retaliation against those who complain about violations). As a result of Defendants' actions, a reasonable person, much less a vulnerable H-2A worker, would be dissuaded from asserting their rights or filing a complaint against their employer.

Failure to provide much needed protection sends the message to employers that they can disregard the assurances and protections they agree to provide nonimmigrant workers when submitting a TEC. Through fear and intimidation, they can silence their workers – even those who are merely requesting basic life necessities like water and food to which they are entitled – and the violations will go undetected. It also conveys the message to vulnerable H-2A workers who are tied to their employer as a result of their H-2A visa status that they are at the mercy of their employer – and there is no help readily available.

It is well-established that an employer's retaliatory acts can irreparably harm workers, particularly where those acts deter potential complainants from coming forward to challenge the employer's illegal conduct. *Hopkins v. Cornerstone Am.*, No. 4:05-CV-332-Y, 2006 WL 8453061, at \*2 (N.D. Tex. Feb. 6, 2006), *citing Holt v. Cont'l Grp.,* 708 F.2d 87, 91 (2d Cir. 1983) ("A retaliatory discharge carries with it the distinct risk that other workers may be deterred from protecting their own rights . . . or from providing testimony for the plaintiff in her effort to protect her own rights.  These risks may be found to constitute irreparable injury."); *see also Carrillo v. Schneider Logistics,* 2012 WL 556309 (C.D. Cal. 2012) ("courts routinely recognize that retaliatory discharges deter workers from vindicating their statutory rights and seeking access to courts, and that these injuries constitute irreparable harm"); *Perez v. Fatima/Zahra, Inc.*, 2014 WL 2154092, at \*3 (N.D.Cal. 2014) (If Defendants are able to block Plaintiff's investigation, then Defendants' employees' rights under the FLSA may be irreparably injured); A*rcamuzi v. Cont'l Air Lines, Inc.,* 819 F.2d 935, 938–39 (9th Cir.1987) (where "employees may be deterred from engaging in legitimate conduct," retaliation for the exercise of protected activity represents "possible irreparable harm far beyond economic loss").

Moreover, the failure to provide adequate water poses a serious health risk to workers, and courts have held that demonstrated risks to health and safety suffice to establish irreparable harm. *See, e.g., Valentine v. Collier*, 455 F. Supp. 3d 308, 327 (S.D. Tex. 2020) (finding risk of COVID-19 infection in a prison as an irreparable harm); *Heather K. by Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1266 (N.D. Iowa 1995) ("as to 'irreparable harm,' continued open burning poses a very real health threat, possibly even a mortal threat … for which she has no adequate remedy at law."); *Texas Indep. Union of Caroapolis Terminal v. Texaco, Inc.*, 452 F. Supp. 1097, 1107 (D.C. Pa. 1978) ("no adequate remedy at law" for threats to health and safety of employees)

(*citing United Steelworkers v. Blah-Knox Foundry and Mill Mach., Inc.*, 319 F. Supp. 636, 641 (W.D. Pa. 1970)).  Therefore, the Secretary can demonstrate irreparable harm.

Defendant Rivet LLC also continues to violate the H-2A provisions by failing to comply with the Field Sanitation standards as set forth in 29 C.F.R § 1928.110 in each field where its H-2A workers are working. As is evidenced in this case, Rivet LLC H-2A workers are often at the mercy of the Defendants in getting necessary food and water.  In addition, the workers reported that there are no toilet or hand washing facilities in the fields. They take toilet paper with them into the fields and use their drinking water to wash their hands. These violations pose a health risk to the employees.

The INA and DOL's implementing H-2A regulations authorize injunctive relief to stop retaliation and to order specific performance of an employer's H-2A responsibilities. Thus, in order to prevent irreparable harm, the TRO and preliminary injunction must include an order that the Defendants provide sufficient and suitably cool potable drinking water that meets the needs of all workers present, as well as individual drinking cups, and toilet and handwashing facilities (and soap) as required by the Field Sanitation standard.

### E.  The Balance of Equities Tilts Sharply in the Secretary's Favor and an Injunction is in the Public Interest.

The balance of equities in this case tilts sharply in the Secretary's favor, and issuing a TRO is in the public interest. *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 471 (5th Cir. 2017), overruled by *Planned Parenthood of Greater Texas Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020) (addressing how public interest must be weighed against Plaintiffs' potential harm); *see Independent Living Ctr. Of S. Cal., v. Maxwell-Jolly*, 572 F.3d 644, 657-58 (9th Cir. 2009).  In considering the balance of equities in a case involving the Secretary, "the right of the United States or any agency thereof to obtain an

injunction provided by statute stands upon a different footing than a private party's right thereto." *U.S. v. Neset*, 10 F. Supp.2d 1113, 1115 (N.D. 1998), *quoting United States v. Beatty*, 88 F.Supp. 646, 651 (S.D.Iowa 1950); *see also*, *Perez v. Jie*, 2014 WL 1320130, at *2 (W.D. Wash Mar. 31, 2014) ("in cases involving the Secretary of Labor, the Court 'must give substantial weight to the fact that the Secretary seeks to vindicate a public, and not a private right.'") (*quoting Marshall v. Chala Enters.*, Inc., 645 F.2d 799, 802 (9th Cir. 1981)).  As stated by the Fifth Circuit, "the manifest difficulty of the Government's inspecting, investigating, and litigating every complaint of a violation weighs heavily in favor of enforcement by injunction." *Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir. 1962).

Two other federal courts have granted injunctive relief where H-2A employers violated H-2A provisions and endangered workers. *See Acosta v. Marin J. Corporation*, No. 1:18-CV-00184 (E.D. Mo. Aug. 7, 2018) (Order Granting Preliminary Injunction); *Acosta v. G Farms, LLC*, No. CV-17-01446-PHX-DLR (D. Ariz. May 19, 2017) (Order Granting Stipulated Entry of Preliminary Injunction). (Exhibits 2 and 3).

An order requiring the employer to notify the workers of their rights under the law is necessary to ensure that Defendants abide by their obligations. *See Kasten v. Saint Gobain Performance Plastics Corp.*, 531 U.S. 1, 12013 (2011) (expressing concern that "fear of economic retaliation" may induce workers "quietly to accept substandard conditions"). Moreover, the Secretary only seeks to require the Defendants be ordered to comply with the obligations it has agreed to undertake as an H-2A employer. According to Rivet LLC's counsel, Glynn Rivet has already divested himself from the ownership of or management responsibilities for the company; therefore, Rivet LLC cannot assert any hardship simply from being enjoined from activity it claims it unilaterally took.

Finally, the Secretary seeks an immediate injunction because it has evidence the dangerous activities have resumed and an injunction is necessary to ensure the safety of the current, former, and prospective H-2A workers. The balance of equities clearly weighs in the Secretary's favor.

### III. CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that the Court enter a temporary restraining order providing immediate relief to the H-2A workers who may still be in harm's way, and to issue an order to the Defendants to show cause why a preliminary injunction should not issue.

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

JOHN RAINWATER
Regional Solicitor

CONNIE M. ACKERMANN
Deputy Regional Solicitor

|  |  |
|---|---|
|  | UNITED STATES OF AMERICA, by |
| MARGARET TERRY CRANFORD | ELLISON C. TRAVIS |
| Counsel for Wage & Hour | ACTING UNITED STATES ATTORNEY |
|  |  |
| */s/Dolores G. Wolfe*_____ | */s/ Davis Rhorer Jr.*_____ |
| DOLORES G. WOLFE | Davis Rhorer Jr., LBN 37519 |
| Trial Attorney | Assistant United States Attorney |
| Texas Bar No. 00794323 | 777 Florida Street, Suite 208 |
| wolfe.dolores@dol.gov | Baton Rouge, Louisiana 70801 |
|  | Telephone: (225) 389-0443 |
| U. S. Department of Labor | Cellphone: (225) 326-5710 |
| Office of the Solicitor | Fax: (225) 389-0685 |
| 525 Griffin Street, Suite 501 | E-mail: davis.rhorer@usdoj.gov |
| Dallas, Texas 75202 | *Local Counsel* |
| Telephone (972) 850-3129 |  |
| Facsimile (972) 850-3101 |  |